## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 13-20039-TLM** |
| PHILIP L. HART, | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 13-07016-TLM** |
| | ) | |
| PHILIP L. HART, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| UNITED STATES TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 13-07017-TLM** |
| | ) | |
| PHILIP L. HART, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

## MEMORANDUM OF DECISION
———————————————————————

In this adversary proceeding, the Court must determine if a chapter 7 debtor is entitled to a discharge of his debts. In litigating this issue, the parties addressed events, disputes and litigation spanning two decades and three bankruptcies.

MEMORANDUM OF DECISION - 1

In June 2013, the United States Trustee ("UST") filed a complaint

objecting to the discharge of debtor Philip L. Hart ("Hart") under § 727(a),

commencing Adv. No. 13-07017-TLM.[1]  Prior to that complaint being filed, the

United States on behalf of the Internal Revenue Service ("IRS") had filed a

complaint initiating Adv. No. 13-07016-TLM.  The IRS objected to the

dischargeability of significant tax liabilities under § 523(a) and to Hart's discharge

under § 727(a).   In September 2013, the two adversary proceedings were

consolidated with the IRS' action becoming the lead case.

In the summer of 2014, the IRS and Hart settled certain aspects of litigation

before the United States District Court for the District of Idaho in *United States of

America v. Philip L. Hart*, Case No 11-cv-00513-EJL (the "District Court Case").[2]

Under that settlement, Hart agreed to entry of a judgment establishing that Hart's

1996–2008 tax obligations, including interest to December 31, 2013 (amounts

totaling $392,968.81), were nondischargeable and that statutory interest would

continue to accrue thereon.  The agreed judgment also provided that penalties and

interest on penalties (amounts totaling $193,335.89) would be dischargeable in the

event this Court ultimately granted Hart a discharge.  The final amount of the

---

[1]  Unless otherwise indicated, statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and rule references are to the Federal Rules of Bankruptcy Procedure.

[2]  *See* Ex. 95 ([Proposed] Stipulated Judgment Pursuant to Settlement Agreement, filed December 19, 2014), and Ex. 97 (Stipulated Judgment Pursuant to Settlement Agreement, entered and filed Jan. 5, 2015) (both referencing June 2014 settlement documents).

MEMORANDUM OF DECISION - 2

judgment, including all categories, was $586,304.70 as of December 31, 2013.[3]

The IRS and Hart also successfully negotiated a settlement of their bankruptcy litigation. Hart wanted to keep the terms of the settlement confidential, and the parties agreed that he could seek an order from this Court sealing the record. He sought that relief, but it was denied by this Court's decision and order in September 2014. Adv. Doc. Nos. 38–39. Under this agreement, an agreed judgment would be entered establishing the amount of Hart's tax obligations and the § 523(a) nondischargeability of those amounts and interest accruing on such amounts. The District Court's Stipulated Judgment did so. The IRS also agreed to, and later in this Court did, dismiss its § 727(a) claims. But both the agreement and the later order dismissing the IRS' § 727(a) claims recognized the UST's ability to continue the pursuit of its separate § 727(a) action.[4] This was the reason for the qualification in the District Court's judgment as to potential discharge of penalties and interest on penalties.

The UST's § 727(a) action came on for trial pursuant to notice on February 3–5, 2016. The parties appeared through counsel of record, and the events of the

---

[3] The parties' agreement also provided that the real property in which Hart resided, discussed extensively *infra*, could be sold upon entry of an order of the District Court.

[4] Notwithstanding the settlement and judgment, the consolidated nature of these adversary proceedings was never altered. Thus, the record regarding the instant trial is in the docket of Adv. Case No. 13-07016-TLM, and a combined caption is used on this Decision.

MEMORANDUM OF DECISION - 3

trial are reflected in the Court's minute entries.[5]  The matters were taken under

advisement when post-trial briefing was completed in June 2016.[6]  This Decision

constitutes the Court's findings of fact and conclusions of law.  Rule 7052.

## JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b)

and 28 U.S.C. § 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

The UST's complaint was timely filed.  Rule 4004(a).

## FACTS

### A.    Debtor's background

Hart received a bachelor of science degree in civil engineering from the

University of Utah in 1980.  He earned a master's degree in business

administration (MBA) from the Wharton School at the University of

Pennsylvania.  He works as a licensed structural and civil engineer.[7]  He also

served from 2004 to 2012 in the House of Representatives of the State of Idaho,

sitting on the State Affairs, Revenue and Taxation, Judiciary and Rules, and

Transportation Committees.

---

[5]  Adv. Doc. Nos. 110–112.  There were 134 exhibits admitted, which included several depositions and transcripts of § 341(a) meetings.  The trial transcript, Adv. Doc. No. 113 (hereafter "Tr."), runs over 500 pages.

[6]  That briefing totaled 233 pages.  Adv. Doc. Nos. 115, 119, 123.

[7]  Hart formed AEG, LLC in 2009 as a single member Idaho limited liability company, and conducts, through AEG, his professional engineering business under the name Alpine Engineering.

Hart's testimony and demeanor generally reflected his higher education and professional background. He appeared to be intelligent, was articulate, and his responses to questioning were for the most part precise. He generally was not argumentative. He answered carefully, often clearing up ambiguities in poorly phrased questions. He also at times in his examination clarified details or facts misstated in his counsel's excessively leading questions. Inconsistently, however, Hart on several occasions asserted that he was unable to remember or recall acts, events, discussions or details that were fundamental if not critical to the matters being litigated.[8]

### B.    Underlying tax issues

Hart filed federal income tax returns for 1994 and 1995, but claimed no liability or obligation to pay based on his personal interpretation of constitutional and tax law, and his conclusion that a person's wages and salary are not taxable "income." Hart did not file a return for 1996. These three years became the foundation of the initial disputes between Hart and the IRS, though they continued for many years.

Hart described his research on the subject of "income" and the Sixteenth

---

[8]   The Court has carefully considered Hart's credibility, as well as the weight to be given his testimony, even where such matters are not highlighted in this Decision. The same is true regarding the other nine witnesses who testified at trial. *See Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 731 (9th Cir. BAP July 30, 1999) ("the bankruptcy judge was entitled, and is indeed enjoined, to evaluate the credibility of witnesses and to determine whether or not he believed their testimony"), *aff'd mem.* 5 Fed.Appx. 743 (9th Cir. 2001); *see also Gugino v. Clark (In re Clark)*, 548 B.R. 246, 257 (9th Cir BAP 2016) (citing *Beauchamp*).

Amendment, which he said included his review of "every document" on the

subject contained in the Library of Congress.  He ultimately wrote and in 2004

published a 400+ page book, "Constitutional Income: Do You Have Any?" which

is currently in its 3rd edition.[9]  In the process of preparing his book, Hart also read

and analyzed numerous reported court decisions.[10]

The IRS disagreed with Hart's position regarding his income taxes for

1994–1996, and this commenced what would become a lengthy and eventually

litigated dispute.  In 1998, after the IRS rejected the position he had taken, Hart

petitioned the U.S. Tax Court.[11]  He was unsuccessful there and, in 2001, the

Ninth Circuit Court of Appeals affirmed the Tax Court.[12]  Hart then petitioned the

Supreme Court of the United States for a writ of certiorari, which was denied in

2003.  Hart thereafter prepared and filed returns for the years through 2002.

In the subsequent process of collection of the tax liabilities, Hart completed

an IRS "collection information statement" ("CIS") and signed it under penalty of

---

[9]  Hart testified that, among his several disputes with the IRS, his claimed business expense deductions incurred in researching, preparing and publishing his book were disallowed, resulting in assessment of what he believed to be excessive tax liabilities.

[10]  *See*, *e.g.*, "Constitutional Income," Ex. 36 at 425–28 (table of cases).

[11]  Exs. 34, 35.

[12]  *See* Ex. 27 (Tax Court decision), Ex. 28 (decision in *Hart v. Commissioner of Internal Revenue*, Case No. 01-70173 (9th Cir. July 31, 2001) (also reported at 14 F. App'x. 990, 88 A.F.T.R.2d 2001–5432) (affirming Tax Court decision, and granting the IRS' request for sanctions given an appeal that was "wholly without merit").

MEMORANDUM OF DECISION - 6

perjury, certifying that it was "true, correct and complete."[13]  It was received by

the IRS on September 20, 2004.  Hart acknowledged that he knew the CIS would

be relied upon by the IRS in its collection of taxes.[14]

Among other things, the CIS showed both his personal and business

address as "2900 Government Way [#] 262, Coeur d'Alene, Idaho."  Hart

conceded at trial, however, that this address was nothing more than a UPS store

location where he received mail.

Hart actually had, at that time, a business address on Front Street in Coeur

d'Alene, Idaho.  He explained he did not list this address on the CIS because the

property was a rental and he had been told by the landlord it would only be

available for a year.  Hart admitted, though, that he maintained that business

property on Front Street for another four or five years.

## C.    The Sarah Loop Property

Hart also failed to disclose on the CIS the residence where he had lived for

several years.  His response in the statement merely indicated that he rented, and

did not own, a home.

In 1995, Hart purchased 10 acres of real property in Kootenai County,

---

[13]  Ex. 29.  His signature appears twice, with dates of Nov. 18, 2003 and Sept. 16, 2004.

[14]  A "collection information statement" (IRS Form 433A) "discloses an individual's income, expenses, assets, accounts, and liabilities so the IRS can assess an individual's ability to pay outstanding taxes."  *United States v. Wanland*, 830 F.3d 947, 950 (9th Cir. 2016).

Idaho.[15]  It ultimately would be assigned the address of 4430 E. Sarah Loop,

Athol, Idaho ("Sarah Loop Property" or, at times, simply the "Property").  Starting

in 1996, Hart constructed a 2,888 square foot log and conventionally framed

residence on the Property.[16]  Some of the logs and timber used in construction

were commercially purchased by Hart, but some were illegally harvested from

Idaho State Endowment Land.  Hart acknowledged that the State sued him for this

conduct and received a judgment against him.

Hart started living at the Sarah Loop Property in 2001 or so, apparently as

it was nearing completion, and lived there continually thereafter until the Property

was sold in early 2016 under District Court order.

### D.    The Trusts

Hart testified he had been involved in a bitter divorce, was concerned about

his relationship with and the protection of his then-minor daughter Sarah, and that

these concerns ultimately led him to attempt to create two trusts.

#### 1.    The White Peak Ventures Trust ("WPV Trust")

In 1997, Hart became acquainted with Tim E. Ortega and Ortega's

---

[15]  The initial warranty deed to Hart was recorded on October 26, 1995, but another
warranty deed was recorded on January 12, 1996, to correct the legal description.  Exs. 42, 43.

[16]  Hart testified that construction was self-financed, and that there were never loans
secured by the property with the exception of the $30,000 purchase price for the raw land, which
debt was paid off within a few years.

MEMORANDUM OF DECISION - 8

associate, Clementine Estrada.[17]  Hart testified that he believed they were experienced in estate planning and trust issues, though he did not explain precisely why he had that view other than referring to his attending an Ortega seminar in Spokane, Washington.  He acknowledged that Ortega never claimed to be an attorney.  Estrada testified she was not an attorney and never told Hart that she was one.

Hart paid Ortega to create a trust—which Hart understood would be an "irrevocable" trust—into which he could contribute the Sarah Loop Property.  Hart's professed intent was to protect this real property for Sarah's benefit.[18]  He indicated the plan or concept generally was that he would complete and live in the residence on the Property and, as a trust "manager" (but not "trustee") be required to maintain the residence and Property as an asset of the trust until Sarah turned 45 when it would be conveyed to her.[19]  According to Hart, Sarah visited the property and stayed with him only for holidays and extended vacations, and never "lived" there.

A "declaration of trust" dated July 1, 1997, and executed by Ortega was

---

[17]  Estrada's deposition testimony, Ex. 225, was admitted in lieu of live testimony.  It reflects she and Ortega operated a business in San Diego providing people with trusts, corporate documents and other similar materials.

[18]  Hart indicated he had heard generally of "children's trusts" or "children's irrevocable trusts" and that this knowledge motivated him, but those details were not clearly explained.

[19]  Sarah was 27 at the time of the trial.

MEMORANDUM OF DECISION - 9

recorded in the Kootenai County real property records on August 8, 1997.[20]  It

specifically refers to the WPV Trust.  Hart testified that he neither saw nor

executed any trust agreement or document at that time.  Hart did indicate that

Ortega at some point provided him a 150-page, draft trust agreement, but that he

had returned it to Ortega unsigned.  Hart therefore knew, and testified, that "I

know for sure a [WPV] trust document was never executed."[21]  Hart testified that

he may have at one time had a copy of some trust-related documents, apparently

including those regarding the WPV Trust as well as a subsequent trust, but a

number of his records were lost in moves of AEG's rented business location in

2005 and 2006.[22]

The "declaration of trust" names Ortega as the trustee and asserts the trust

is "an irrevocable, inter-vivos, true Trust[.]"  Estrada was identified as the

"protector" of the trust.[23]  It also indicates a "Kenneth Breno" was the "trustor"

---

[20]  Ex. 44 ("White Peak Ventures[,] An Irrevocable Contract in Trust Form at Law[,] Declaration of Trust").  This document asserts it is "In Full Force and Effect Under Trust Dated Jan. 1, 1996."  Estrada could not explain the document's reference to a date that was over a year and a half earlier.  Ex. 225 at 38–39.  Estrada also testified that she did not create or draft this document.  Rather, it was something provided to her and Ortega in 1994 by a Pennsylvania attorney, and they simply used it as a form.

[21]  Tr. at 365.

[22]  Hart's "loss" of records due to relocation of his business is addressed *infra*.

[23]  Estrada explained that a protector "is charged with the responsibility of assuring that the trustee acts in accordance [with the trust] to the benefit of the beneficiaries."  Ex. 225 at 22.  But she never knew who the beneficiaries of the trust were.  *Id.* at 26.

MEMORANDUM OF DECISION - 10

though he contributed nothing more than possibly $21.00 in cash.[24]

Hart is not identified anywhere in this document as the grantor, trustor, trustee or otherwise involved with the WPV Trust.  Hart transferred the Sarah Loop Property to Ortega—as trustee of the WPV Trust—by way of a "real property deed to [a] trust" recorded on August 8, 1997.[25]

This initial transfer of the Sarah Loop Property into trust came without Hart's receipt of any consideration.  Despite this 1997 transfer, which was clearly without value given, Hart responded "No" on the 2004 CIS when asked "In the past 10 years did you transfer any assets out of your name for less than their actual value?"  Ex. 29 at 3.

### 2.    The Sarah Elizabeth Hart Trust ("SEH Trust")

Hart testified he quickly lost confidence in Ortega, though he did not explain precisely why.  Hart then met at least three times with Gordon Ormesher[26] and Gordon's nephew, Jeffrey Ormesher.  The Ormeshers either professed to have, or Hart believed they had, some expertise in estate planning and trusts.  Hart knew that neither of the Ormeshers was an attorney, though Hart said he in some

---

[24] Estrada indicated that Breno was an acquaintance of Ortega's.  Breno's role in the transaction, beyond whatever the $21.00 was meant to signify, is unclear.

[25] Ex. 46.  Hart later executed and caused to be recorded another such deed to correct the legal description.  *See* Ex. 49 (dated and recorded August 25, 1997).

[26] Gordon Ormesher's deposition, Ex. 230, was admitted in lieu of live testimony.  He stated that he came to know Hart in the mid-1990's in connection with a group known as the "Citizens for Constitutional Government."  *Id.* at 12.

MEMORANDUM OF DECISION - 11

fashion was led to believe there were attorneys assisting them.

Hart had the Ormeshers create the SEH Trust. Gordon Ormesher thought the trust's creation likely occurred in October 1997. He also said Hart was given a copy of the trust document, if not the original.[27] Gordon had at one time seen the trust document, which he said was created by Jeffrey.[28] Jeffrey testified however that he did not remember preparing the document, though he was probably its first trustee.[29]

Hart characterized what the Ormeshers prepared as "boilerplate documents," but he did not produce a copy of those documents. He admitted the same were provided to him, but claimed they, too, were lost in the later moves of AEG's office. Hart said he had requested copies of the SEH Trust documents from both the Ormeshers but was "unsuccessful."

Gordon Ormesher said that the purpose of the SEH Trust was for Hart to secure and protect the Sarah Loop Property for his daughter and that Hart would live in the Property "rent free" and maintain, improve, and "manage" the Property

---

[27] Ex. 230 at 19, 24.

[28] Ex. 230 at 24, 29. Despite Gordon's testimony, the record in Hart's bankruptcy case contains a declaration, *see* Case No. 13-20039-TLM, Doc. No. 121, executed by Gordon speaking to *his* creation of the SEH Trust, and asserting that it was executed by him as "Creator," by Hart as "Settlor," and by Jeffrey as "Founding Trustee." Exhibit 155, a copy of that declaration, was not admitted at trial. However, the Court takes judicial notice of its files and records, *see* Fed. R. Evid. 201.

[29] Though testimony was at times less than clear as to which Ormesher was being referred to, Hart did say that Jeffrey was a "good trustee" at least initially.

MEMORANDUM OF DECISION - 12

for her.  He also understood that the Property would go to Sarah at the time of

Hart's death.

Gordon also stated he had never heard of the WPV Trust, nor was he aware

of the prior transfer of the real property into that "irrevocable" trust, and that he

did not assist in the subsequent transfer of that property into the SEH Trust.

However, his declaration filed in the bankruptcy case acknowledges that he agreed

to help Hart create a new trust and reflects his awareness of the purpose, and

accomplishment, of the transfer of the real property from the WPV Trust into the

SEH Trust.

### a.    Transfer of the Sarah Loop Property into the SEH Trust

A warranty deed executed by Ortega as trustee of the WPV Trust,

transferring the Sarah Loop Property to the SEH Trust, was recorded on

December 18, 1997.[30]  This transfer was done at Hart's request and direction.[31]

### b.    Acquisition and transfer to the SEH Trust of a tractor

While the Property is the most significant asset at issue, a Massey Ferguson

---

[30]  Ex. 47.  While this December 1997 recording date was verified, Hart stated that the August 9, 1997 execution date was not correct, though he said he didn't note that problem in 1997.  Hart acknowledged at trial that the document was received in October 1997.  *See* Ex. 52. Hart could not explain the reason for the backdating.

[31]  Estrada testified, however, that as the "protector" of the WPV Trust, she would have concerns regarding a transfer of the trust's assets without the express consent of its beneficiaries (*i.e.*, Sarah).  Ex. 225 at 26–27.

MEMORANDUM OF DECISION - 13

tractor was also discussed. Hart purchased the tractor with a cashier's check for $6,500 in April 1996, and received a bill of sale.[32] This was the sole asset, other than the Sarah Loop Property, transferred by Hart into the SEH Trust, and it was transferred without Hart receiving any consideration.[33] Except as discussed later in this Decision, the tractor has been continually located at the Sarah Loop Property and under Hart's control and is used by him on that Property.

### E.    Operation of the SEH Trust

Jeffrey Ormesher recalled that a trust statement or initial declaration existed for the SEH Trust. Jeffrey, however, had no documents and professed having no role in creating any documents. He did concede, though, that he was named as the trustee of the SEH Trust (perhaps with a second but unnamed individual) and that he never "resigned" from that position.

Though designated as trustee, Jeffrey Ormesher never visited or inspected the Sarah Loop Property in Athol, Idaho. He did not establish the "rent" Hart would pay to the SEH Trust in order to reside there. He never collected any rent, or paid any expenses of the SEH Trust. He kept no records for the SEH Trust. In short, his testimony established that he never conducted himself as trustee. In fact, it effectively reflected that he lacked any understanding of what the role and

---

[32] Ex. 40.

[33] The 2004 CIS that Hart provided to the IRS, Ex. 29, also did not disclose this transfer, which occurred within the preceding ten years for less than the asset's actual value.

MEMORANDUM OF DECISION - 14

obligation of a trustee entailed.  He deferred to Hart in all aspects regarding the SEH Trust and its operations.

After a number of years Hart could no longer find Jeffrey Ormesher and approached other individuals to become trustee.  In 2005, and at Hart's request, Jon Lafferty became the successor trustee of the SEH Trust.  Lafferty was a real estate professional and a business acquaintance of Hart's stemming from Lafferty's attempts to find an office location for Hart's engineering business.  Lafferty also considered Hart a friend.  Lafferty indicated he had a very short in-person or telephone conversation with Hart, in which Hart simply indicated that he needed a trustee for the SEH Trust because a previous trustee had resigned.

Lafferty had never been a trustee before.  He did no research and made no inquiries as to what his responsibilities as a trustee would be.  Hart advised Lafferty that the SEH Trust's assets consisted of the Sarah Loop Property and a tractor and that Lafferty's role as a trustee was mainly to ensure that, if Hart died, the Property would go to Sarah.[34]

Lafferty was trustee of the SEH Trust from 2005 to 2013.  He could not recall ever meeting the beneficiary, Sarah, or communicating with her.  He never provided reports, accountings or other information about the SEH Trust to her or

---

[34] Lafferty conceded during examination that he believed any "irrevocable" trust established for Sarah's benefit could not be changed.  He also indicated that, had he been told of a transfer of the real property from one irrevocable trust (*i.e.*, the WPV Trust) into the SEH Trust, it would have raised questions.

to others for her benefit.  When Lafferty became trustee, he did not request an accounting of the SEH Trust's affairs from the prior trustee(s).  Nor did he at any time see any documents regarding the SEH Trust, including any deeds or other documents involving the transfer of any property into the SEH Trust.  When he was later named as a party in the IRS' District Court Case against Hart and received a subpoena requiring production of all SEH Trust records, Lafferty produced none because he never had any.[35]

Hart effectively operated, managed and ran the SEH Trust in all material regards.  The SEH Trust's "trustees" existed in name only.

### 1. Rent, expenses and records

Lafferty understood, from Hart, that Hart had the right to live on the Property.[36]  He also knew that Hart took care of virtually everything involving the Property, including payment of all utilities, repairs, and real estate taxes.  Hart never provided Lafferty any documents or accountings for any of the financial transactions related to the Property.  Lafferty never (1) filed or paid any taxes; (2) kept any financial or documentary information; (3) dealt with upkeep or repair; (4) got keys to the Property; or (5) established what rent would be paid, collected rent,

---

[35]  To the extent that filings in the District Court Case are not admitted exhibits, the Court takes judicial notice of them.  *See* Fed. R. Evid. 201.

[36]  There was a lack of testimonial clarity as to whether, under the alleged trusts, the Sarah Loop Property would be transferred to Sarah when Hart died, or when Sarah turned 45, and/or whether Hart's lifetime residency was assured even if ownership was transferred to Sarah when she reached 45.

MEMORANDUM OF DECISION - 16

or ever knew or verified that rent was paid.  He did testify that he was invited to the Property by Hart at one point, and that Hart asked for Lafferty's opinion on the best way to make certain repairs or modifications, but he conceded that in doing so Hart was not asking for his "permission."

Hart handled all financial aspects and all the details involving the Property. Hart determined an initial $600/month amount of rent, and this amount never changed.[37]  Hart said he would put $600, in cash, into his desk drawer at the residence each month, and would withdraw cash from the drawer as needed for expenses related to the house.[38]  He said there was rarely more than one or two month's worth of "rent" in the drawer at any time, and often no cash there at all. In the event there was no cash when an expense needed to be paid, he would "loan" the money to the trust (*sans* any documents or records) and adjust the "rent" accordingly.

Hart kept no records of the rent paid to, or the transactions of, the SEH Trust, whether in the form of ledgers, summaries, income and expense statements, or otherwise (except for some loose "receipts" for items he paid for in cash).  He never established or used a checking account for the SEH Trust.  He dealt in cash but also used a WalMart debit card at times, and would re-load it by using cash.

---

[37]  Hart did disclose in the 2004 CIS that his residential rent was $600 per month, though not to whom it was paid.  As noted earlier, he did not disclose that he had previously owned the residential real property that he now "rented" or that he had transferred it to a trust.

[38]  According to the testimony, one exception was made to this usual dealing in cash; real estate taxes and utilities were "generally" paid by Hart through money orders.

MEMORANDUM OF DECISION - 17

Hart testified that an attorney, John Green, advised him that he did not need to keep records of or for the SEH Trust. Green prepared an April 2015 affidavit at Hart's request that asserted there were no regulations establishing a requirement that Hart or the SEH Trust's trustee keep any records. Ex. 171. Green was also called to testify.

Green has been Hart's friend since 1997 or 1998. Green is a lawyer, and indicated he is licensed in Texas and Washington, but he has no office in either state. Green lives in Idaho, but he is not licensed to practice law in Idaho. Green's areas of practice include "some" federal tax work and, in his words, "lots of 'liberty-related' issues."

Green never talked with the putative trustees, including Jeffrey Ormesher or Lafferty (though he said he met Lafferty briefly once), or with Sarah Hart. Green also did not recall ever seeing or reading any SEH Trust document. Nevertheless, despite this lack of information or inquiry, his testimony and affidavit establish that he gave Hart legal advice regarding the SEH Trust.[39] When cross-examined about the IRS forms of income tax returns for trusts and instructions, he admitted he had seen such forms before but had never prepared any. And he stated he was unaware of the gross income threshold that triggers the

---

[39] The evidence establishes that Green gave such advice to Hart in Idaho while not licensed to practice law in this state. The Court will refer that matter to the Office of Bar Counsel for the Idaho State Bar for such inquiry as it deems appropriate.

need to file those returns.[40]

As noted, Hart never kept records regarding the trust in the form of ledgers, bank accounts, or income statements, but he did keep "in a box someplace" some "receipts" of expenses related to the residence that were paid for in cash (*e.g.*, purchase receipts for items bought at Home Depot). From these, he created after-the-fact summaries of expenses for the years 2008–2011.[41] He also prepared a declaration with similar information regarding 2012.[42]

### 2.    Use of the tractor

Hart did allow the Massey Ferguson tractor, which he contended was owned by the SEH Trust, to be used by other parties. But this only occurred about three times. It otherwise stayed on the Property since its 1996 acquisition and was used by Hart. He said that Lafferty, as trustee, was asked if that use by others would be acceptable. Lafferty recalled, however, only one time when he was told or advised that someone other than Hart was using the tractor, and disagreed that he was asked by Hart to give permission or approval.[43]

A friend and neighbor of Hart's, Shaun Mosqueda, testified that he had

---

[40] Blank IRS Forms 1041, with instructions, were marked as Exs. 37 and 38, and referred to during examination of Green but were not offered.

[41] *See* Exs. 301– 308.

[42] Ex. 300.

[43] Lafferty also indicated that, once, Hart informed him that the tractor had been repaired, but that he was not asked for permission or approval to have the equipment repaired, nor was he requested to "reimburse" Hart for the expense.

MEMORANDUM OF DECISION - 19

helped Hart with some phone line work in 2011 and 2012.  Hart wanted to pay

Mosqueda, who demurred, but asked if perhaps he could use the tractor in lieu of

payment.  According to Mosqueda, Hart said he "had to check" but didn't indicate

with whom.  About two weeks later Hart told Mosqueda it was acceptable, who

then used the tractor from April to August 2012.

### F.    The IRS pursues recovery

As noted, in the CIS Hart signed in 2003 and again in 2004, he told the IRS

that he had not transferred any property in the preceding 10 years for less than its

actual value.  He had, however, transferred the Sarah Loop Property into the WPV

Trust in 1997 and at some point transferred the tractor, first acquired in 1996, into

the SEH Trust.  Neither transfer was disclosed.[44]  However, Hart's responses on

the CIS provided other information to the IRS.  The IRS started garnishing Hart's

legislative pay starting in 2005 and, according to Hart, continuing until his first

bankruptcy filing.

In 2007, Hart formed his civil engineering business, Alpine Consulting

Group, LLC.  That structure changed with his creation of AEG two years later.

Hart treated them as one and the same, save for the name change.  Hart is the sole

member of the LLC.

---

[44]  Hart initially testified that he could not remember if he, or someone else "representing him" filled out the CIS, Ex. 29.  (Hart referred to John Turner.  The exhibit has a typed insert "call POA John Turner" and provided a phone number.)  Hart then stated he did not remember if he "read" the CIS before signing it.  Tr. at 292–93.  As noted earlier, he actually certified it to be true, accurate and complete, under penalty of perjury, and signed it in both 2003 and 2004.

In 2008, the IRS issued a notice of federal tax lien regarding Hart's taxes in certain years between 1995 and 2005 totaling slightly over $155,000. Also in 2008, the Idaho State Tax Commission ("ISTC") issued a notice of deficiency. In 2010, the IRS issued another notice of federal tax lien for certain years between 1997–2006 totaling approximately $280,000, and another notice of tax lien in 2010 for 2008 taxes of about $13,000. Each of the notices listed, as the taxpayer, the SEH Trust as nominee of Hart.[45]

Also in 2010, Hart transferred an Audi automobile that he had purchased earlier for $9,000. He transferred it to White Snow, LLC, an entity he formed three years earlier. White Snow had two members, Hart and Cliff Knoll. Knoll never contributed anything to White Snow. White Snow from its inception never conducted any business, opened a bank account, or kept any records. The Audi was the sole asset of White Snow, and the gas, insurance, repair and other operating expenses associated with the Audi were paid by Hart, who drove the car.

### 1.    The District Court litigation, and bankruptcy filings

As noted, in October 2011, the IRS filed a complaint in the U.S. District Court for the District of Idaho against Hart and the SEH Trust seeking to fix the amount of taxes (praying for a judgment of almost $550,000) and to foreclose on

---

[45] The notices are part of Hart's Ex. 309, an unsegregated amalgam of documents related to such liens.

the Sarah Loop Property.  The complaint also alleged the transfer of the Sarah

Loop Property was fraudulent, and that the WPV Trust and the SEH Trust were

shams and Hart's nominees or alter egos.

By April 2012, the District Court had denied motions to dismiss and for

extensions of time for discovery, and set a trial date in November 2012.

In May 2012, the IRS, Hart, and Lafferty as trustee of the SEH Trust

entered into a stipulation and consent to judgment in the District Court Case.  Ex.

84.  Under it, the parties agreed the transfer of the Sarah Loop Property from the

WPV Trust to the SEH Trust should be set aside with respect to the IRS.  Also

Lafferty, as the trustee of the SEH Trust as of the date of such stipulation and on

behalf of the SEH Trust, disclaimed any interest in the Sarah Loop Property.  An

order approving the stipulation, and a judgment, were entered on May 2, 2012.

Exs. 85, 86.

Within a month of this stipulation, order and judgment, Hart filed a 2012

chapter 13 bankruptcy case, Case No. 12-20648-TLM ("*Hart I*").[46]  This

bankruptcy filing stayed the District Court Case including Hart's pending

deposition.  *See* § 362(a).  *Hart I* was voluntarily dismissed on August 27, 2012,

based on Hart's lack of eligibility for chapter 13 relief under § 109(e).  Dismissal

terminated the stay and allowed the District Court Case to proceed.

---

[46]  Additional details of this and the other bankruptcy cases filed by Hart are discussed
*infra*.

MEMORANDUM OF DECISION - 22

Two months later, on October 24, 2012, Hart filed a second chapter 13 bankruptcy petition, Case No. 12-21220-TLM ("*Hart II*"). *Hart II* again caused a stay of the District Court Case, though only briefly under the terms of § 362(c). In November 2012, this Court denied Hart's request to extend the stay. The District Court accordingly set additional deadlines for discovery and dispositive motions in its action. On January 2, 2013, *Hart II* was dismissed, once again on the basis of Hart's lack of eligibility for chapter 13 relief under § 109(e).

Two weeks later, on January 16, 2013, Hart filed a third bankruptcy petition commencing Case No. 13-20039-TLM ("*Hart III*"). This case was filed under chapter 7. Given the provisions of § 362(c), the third serial bankruptcy filing did not result in an automatic stay. Hart sought judicial imposition of such a stay, which this Court denied, and the District Court Case continued.

 On June 6, 2013, the District Court entered a Memorandum of Decision and Order. *See* Ex. 94 ("District Court Decision"). The District Court found "it is undisputed that Mr. Hart's attempted transfers of the Property are ineffective as neither recipient [the WPV Trust and the SEH Trust] was a bona fide purchaser for value." The District Court Decision granted the IRS' motion "to the extent [that such motion] seeks a determination that Mr. Hart is the true and beneficial owner of the Property and the United States' tax liens arising from Mr. Hart's liabilities attach to the Property." *Id.* at 38.

MEMORANDUM OF DECISION - 23

### 2. Stipulated judgment and sale of the Sarah Loop Property

Hart and the IRS entered into a settlement agreement in the District Court

Case. *See* Exs. 95 (proposed judgment), 97 (judgment entered Jan. 5, 2015).

Under it, judgment was entered against Hart in the amount of $586,304.70 as of

December 31, 2013, and the Sarah Loop Property could be sold by the IRS on

further order of the District Court.

Upon a March 2015 unopposed motion, the District Court entered an order

for the sale of Hart's residence. District Court Case at Doc. No. 139 ("Sale

Order"). The Sale Order established the sale procedures, including a provision, in

the event Hart was not the high bidder, that Hart would have 7 days after the sale

occurred to vacate the premises (defined therein as the "Date to Vacate"). Under

the Sale Order, Hart was to remove all his personal property by the Date to Vacate

or the same would be deemed abandoned, though Hart could request permission to

return to the property, appropriately accompanied, for the purpose of removing

any remaining personal property.

As reflected by filings in the District Court Case, a sale occurred on

October 1, 2015, and Hart was the high bidder. He thereafter requested a 45-day

extension of the deadline for payment of the balance of the purchase price. *Id.* at

Doc. No. 141. The District Court granted only a 21-day extension. *Id.* at Doc.

No. 144. The District Court there noted that Hart had repeatedly requested

extensions of time throughout the case; the deadlines in the sale process were the

MEMORANDUM OF DECISION - 24

result of an agreement between the parties; Hart was fully aware of the required

time frames; the request for extension was made on the day the balance was due

and owing; and the delay was due to Hart's lack of diligence.  This order

established a November 12, 2015 deadline, and ordered that no further extensions

would be granted.  The November deadline passed without Hart paying the

balance of the purchase price.  *Id.* at Doc. No. 145.

The Sarah Loop Property was ultimately sold to a third party for $182,000

effective on March 31, 2016.[47]

### G.    Representations, and omissions, in the bankruptcies

#### 1.    *Hart I*

In his May 2012 bankruptcy, Hart filed schedules, verifying under penalty

of perjury that they were true and correct to the best of his information and belief.

He said there that he owned no real property.  Ex. 102 at 1.  He disclosed no

unexpired lease of residential property, *id.* at 14 (sched. G), but indicated that he

paid $600/month in rent.  *Id.* at 17 (sched. J).

His attorney in *Hart I*, Michael McFarland,[48] testified that he prepared

those schedules for Hart's review and execution based on Hart's completed

"worksheet" and that it was McFarland's practice to emphasize the need for a

---

[47]  *See* District Court Case, Doc. Nos. 150, 152.

[48]  Debtor's first bankruptcy attorney is no relation to his trial counsel, Charles
McFarland.  Subsequent references to "McFarland" herein are to Michael McFarland.

MEMORANDUM OF DECISION - 25

debtor's total candor and accuracy in filling out such worksheets.

In the worksheet he provided McFarland, Hart wrote under the category of real estate that it was "unknown who owns the residence located at 4430 E. Sarah Loop, Athol Idaho." Ex. 212 at 4. Hart admitted he wrote that entry.[49] Hart also told McFarland that his residence was owned by a "trust" that had been formed more than 10 years previously. McFarland recalls seeing a document, possibly the WPV Trust - SEH Trust deed, Ex. 47, but recalled little additional detail. But it appeared clear that Hart did not provide McFarland details of his creation of the initial trust, or the transfer between trusts. To the extent the trust was "self-settled," McFarland's concern was primarily that it happened more than 10 years earlier, given the call of questions on the statement of financial affairs ("SOFA"). Hart also failed to tell McFarland that he actually collected, handled and fully controlled on behalf of his trust "landlord" the "rent" he paid as well as the property itself.[50]

Recall also that, by the time the *Hart I* petition was filed on May 29, 2012, Lafferty as the trustee of the SEH Trust had already conceded in the District Court Case that the transfer to the SEH Trust should be set aside and that he disclaimed any interest in the Property on behalf of the SEH Trust. Ex. 84 (stipulation filed

---

[49] Tr. at 310. On a copy of that worksheet later produced, evidently at McFarland's deposition, someone other than Hart had written "Sarah Elizabeth Hart Trust" under Hart's comment. *Id.* at 310–11.

[50] Tr. at 410–17, 422.

May 2, 2012).  The District Court entered an order and judgment on that

stipulation.  Exs. 85, 86 (entered May 2, 2012).  Hart was a party in that case, and

he was represented by the same attorney as Lafferty and the SEH Trust.  Nothing

in the evidence reflects that Hart ever advised McFarland of these events and

developments.

McFarland also would have inquired further and have amended the

statement of financial affairs if Hart were in possession and control of property

owned by a third party.  The worksheet did disclose some personal items owned

by Sarah, and a tool owned by a third party, located at the Property.  But despite

making these disclosures, Hart did not mention the tractor, or the rent money in

the drawer, or the Audi, all of which he knew were in his possession and, like

Sarah's items, were by Hart's contention owned by another.

Hart stated in a declaration filed in *Hart III* that he had no intent of

"hiding" all these details from McFarland, and that it was only "[a]fter the first

case [*i.e.*, *Hart I*] had been filed [that] the efficacy of the trust became an issue."

Ex. 154 at 4.  This was false.

Hart was served with the summons in the District Court Case on November

15, 2011, and the efficacy of the SEH Trust was clearly put at issue by the

complaint.  Hart's January 5, 2012 answer in that case specifically denied the IRS'

assertion that "the purported entity known as Sarah Elizabeth Hart Trust is a sham

entity and should be disregarded."  Hart also knew before the filing of the first

MEMORANDUM OF DECISION - 27

bankruptcy petition in May 2012 that the SEH Trust was "at issue" given the developments in the District Court Case, including Lafferty's disclaimer on behalf of that trust. In fact, contrary to the declaration, Hart conceded at trial that, when he filed *Hart I*, he knew the SEH Trust "was an issue and contention in the District Court case." Tr. at 328–29.[51]

At the July 13 § 341(a) meeting in *Hart I*, Hart declined to answer many of the IRS attorney's questions about his interests in the Property and the alleged trusts, or about consideration received for the Property's transfer into trust, or about the reason for the omission of disclosure about the Property and the trusts in the schedules and SOFA. Ex. 216 (§ 341(a) transcript). Though he disclosed that he paid $600/month in rent, he merely indicated that it was paid "to the trust." Hart did not disclose that he personally handled the receipt, as well as the payment, of that rent, in cash. Additionally, when counsel for the chapter 13 trustee asked Hart at this § 341(a) meeting if the trustee of the Trust could confirm receipt of the "rent checks," Hart said "you'll have to ask him" though Hart knew for a fact that there were no "rent checks" at all, and knew that nothing was paid or transmitted to Lafferty as trustee but, instead, the "rent" was in cash and controlled solely by Hart. The chapter 13 trustee, C. Barry Zimmerman, testified at trial that

---

[51] A 1½ page memo from Hart to McFarland, Ex. 210, outlines certain details, facts and questions about the trusts. [Ex. 210 was admitted over Hart's objection. The final exhibit list, Adv. Doc. No. 112-1, does not so indicate, but will be corrected to conform to the Court's trial notes and the transcript, *see* Tr. 326–27.] McFarland was never examined about this letter, and Hart's testimony does not make clear that the memo was ever delivered to McFarland.

such matters would have been material to his administration of the case.

Hart I was dismissed on August 27, 2012, three months after it was filed, on Hart's § 1307(b) motion filed after he had stipulated to a lack of eligibility under § 109(e).

### 2.      *Hart II*

*Hart II*, also a chapter 13 case, was filed two months later on October 24, 2012.  Hart was represented in *Hart II* by attorney Brant Stevens.  Stevens said he used the schedules and statements from *Hart I* and "updated" them for use in *Hart II*.

When Stevens was asked specific questions about what Hart had told him about the SEH Trust, the trust documents, the possession and control of the Property, or the manner in which Hart handled the payment and disposition of rent, Stevens repeatedly responded that he "could not recall."[52]  Stevens did concede, though, that things such as a transfer from one irrevocable trust (WPV) to another irrevocable trust (SEH); Hart's personal collection and subsequent control of the rent paid "to" the SEH Trust; Hart's handling of payments "by" or on behalf of the SEH Trust; and similar matters all would have raised "red flags" to him as counsel.

Hart and Stevens were both asked about claims Hart had made in his

---

[52]  Hart similarly testified that he could not recall.  Given the entirety of the litigation in the bankruptcy cases and the instant adversary proceeding, their repeated assertions of lack of memory and recall on significant and material matters were not credible.

MEMORANDUM OF DECISION - 29

deposition to the effect that he had wanted to list the Property in *Hart II* and admit

that he owned it, but that Stevens argued with him not to do so.  Stevens could not

recall any such argument.  Hart testified that the word "argument" overstated the

tenor of the actual conversation they had regarding the matter.  But he also

testified that he ultimately did not disclose the Property as his own based on

Stevens' advice and advice from "other attorneys too."  He also indicated he

thought because the Property was in an "irrevocable trust" he could not alter that

status and, instead, a court would have to.  Ultimately, Hart's schedule A made the

following disclosure:

> Primary residential property located in Kootenai County, Idaho, at
> 4430 E. Sarah Loop, Athol, ID, 83801.  Tax assessed value of property
> is $202,897.  Debtor believes the property to be worth $186,665.24
> taking into consideration 8% sales costs. *It is the debtor's position that
> the property is not part of this bankruptcy estate due* [*to*] *it being in an
> irrevocable trust.*

Ex. 113 at 3 (emphasis added).  This portion of Hart's verified schedules was filed

on January 13, 2013, *after* Lafferty, as trustee of and on behalf of the SEH Trust

(and represented in the District Court Case by Hart's own attorney, Charles

McFarland), disclaimed any interest in the Property in May 2012.  *See* Ex. 84.

Hart's schedule G did not show his lease of the Property.  He disclosed in

his SOFA, as property "held" for a third party, only some personal property held

for Sarah, but not the cash or the tractor which were in his sole possession and

control but, per his contentions, belonged to another.  He similarly did not disclose

MEMORANDUM OF DECISION - 30

his possession of the Audi (though he did schedule his 50% ownership of White Snow, LLC).

At the *Hart II* § 341(a) meeting, Hart was examined and again refused to answer questions from the IRS about the Property, the trusts, the alleged lease, and similar matters.  He did testify that the $600/month rent shown on schedule J was paid "to the trust" and identified it as the SEH Trust, Lafferty as its trustee, and Sarah as its beneficiary.  Ex. 217.

The Court in *Hart II* denied Hart's motion under § 362(c) to extend the automatic stay.  The District Court thereafter lifted its own order that had stayed the litigation due to the bankruptcy.  This case was, like *Hart I*, dismissed on the basis of Hart's ineligibility under § 109(e).

### 3.    *Hart III*

On January 16, 2013, two weeks after *Hart II* was dismissed, the petition was filed commencing the pending chapter 7 case, *Hart III*.  Hart was once again represented by Stevens.

The disclosure of the Property on schedule A repeated the manner of disclosure in *Hart II*.  Ex. 122.[53]  The tractor was not disclosed.  The SOFA again failed to disclose property held for another person or entity, save minimal personal

---

[53]    Hart only changed the second sentence of that language, deleting the assertion of reduction in value due to an 8% sales cost, and replacing it with "Debtor is investigating fair market value."  The schedule still asserted that the Property was not property of the estate, and valued the debtor's interest in it at $0.00.

property held for Sarah.  No lease was mentioned on schedule G, nor was the cash

in the desk drawer representing rent payments disclosed on the SOFA as the SEH

Trust's property in Hart's possession or control.  *Id.*

On March 4, Hart amended schedule A in three regards.  He first indicated

that his investigation of fair market value was continuing but due to his belief

substantial repairs were needed, he contacted two contractors for bids.  He also

changed the assertion regarding the residence being held in an irrevocable trust to

"Debtor's counsel in another case, Mr. [Charles] McFarland, has conceded that

the transfer of the real property into an irrevocable trust was ineffective."  Finally,

he changed the assertion of the value of the debtor's interest from $0.00 to

"unknown."  Ex. 130 at 1.

### H.    Inquiries, litigation, and further amendments during *Hart III*

The UST commenced an inquiry into the *Hart III* schedules and statements.

Jared Crawford, a UST employee and CPA, sent an April 22, 2013 letter to Hart's

counsel requesting documentation.  Ex. 135.  The documents received by the UST

in mid-May, Ex. 143, included checking account statements from Panhandle State

Bank for AEG, and from Idaho Independent Bank for Hart.[54]  They also included

a number of purchase receipts from various stores with handwritten notations

---

[54]   The IIB account was referred to as a "personal" account, and bore the name "Philip
Hart dba Alpine Press."  Alpine Press was the business through which he published his book.

(mostly stating "petty cash" with dates and amounts).[55]    Hart's reply to the inquiry also included a copy of the December 18, 1997 warranty deed under which the WPV Trust transferred the Property to the SEH Trust.  *Id.*  The UST also received a copy of Hart's 2011 tax return.  Ex. 144.  *See also* Ex. 147 (Crawford summary of materials received).

In April 2013, the IRS sought a Rule 2004 examination, raising issues of the unlisted tractor and the Audi, among others.  Despite testifying at the § 341(a) meeting that the SEH Trust acquired and owned the tractor, Hart filed an amended schedule B on May 3 disclosing that he owned the tractor.  Ex. 138.

On June 6, 2013, the District Court entered an extensive Memorandum of Decision and Order, Ex. 94, that granted partial summary judgment to the IRS. The District Court ruled that "Mr. Hart's attempted transfers of the Property [to WPV Trust and to SEH Trust] are ineffective as neither recipient was a bona fide purchaser for value."  *Id.* at 38.  The District Court thus "grants the [IRS'] Motion to the extent it seeks a determination that Mr. Hart is the true and beneficial owner of the Property and the United States' tax liens arising from Mr. Hart's liabilities attach to the Property."  *Id.*

Eight days later, Hart filed another amended schedule A indicating he owned the Property, and asserting that the assessed value of $202,897 should be

---

[55]  These receipts were provided to show alleged expenses of the SEH Trust that were paid, through Hart, from the rent placed in the desk drawer.

MEMORANDUM OF DECISION - 33

reduced by $133,440 (an estimate to bring it to "marketable condition") resulting in a claimed value of $69,457. Ex. 145. Hart that same day filed an amended schedule C claiming a $69,457 homestead exemption under Idaho Code § 55-1003. Ex. 146.

Hart filed a declaration a month later in which he addressed this change in his sworn disclosures. Ex. 154. He argued that he created an "irrevocable trust" for the benefit of his daughter, and that he could not understand how such a trust could be "revoked." Still, he also acknowledged he created the SEH Trust, after losing confidence in Ortega as trustee of the WPV Trust, and directed that the Property be transferred from that first purportedly irrevocable trust to the new, irrevocable SEH Trust. He also stated that he had believed in the efficacy of the SEH Trust when making the assertions in schedule A of each of the bankruptcy filings, and that he filed the last amended schedule A in *Hart III* only after the District Court entered its June 6, 2013 decision. His declaration did not address his alleged argument with Stevens at the time of the filing of *Hart II* about earlier asserting personal ownership of the Property.

## I.    Litigation over the homestead exemption

On June 28, 2013, the chapter 7 trustee in *Hart III*, John Munding, filed an objection to the claimed homestead objection. The objection challenged the exemption on the basis of judicial estoppel and "bad faith," both contentions being based on Hart's prior assertions in bankruptcy filings that the Property was

held in a trust and that he had no personal ownership of or interest in it.[56]  That matter came on for hearing on August 27, 2013.  The Court issued an oral ruling on October 17, 2013 overruling the trustee's objection.  Ex. 317 (transcript).  Though the UST was not a participant in Munding's objection, its counsel listened to the ruling.  *Id.* at 2.

After addressing the histories of the bankruptcy cases and the District Court Case decision that preceded the amendment of schedule C, the Court addressed the question of judicial estoppel.  That equitable doctrine precludes a party from gaining an advantage by asserting one position and then later seeking another advantage by taking a clearly inconsistent position.  *Id.* at 9 (citing *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)).  The application of the doctrine requires (1) clearly inconsistent positions taken in successive litigation, (2) an acceptance by a court of the earlier position taken, and (3) an unfair advantage obtained by allowing the party to switch positions.  *Id.* at 9–10 (citing *Ah Quin v. County of Kauai Dept. of Transp.*, 2013 WL 3814916, *2 (9th Cir. July 24, 2013)).

There was no doubt that Hart had taken an inconsistent position in three bankruptcies before his *Hart III* amendments and his newly-asserted claim of exemption.  But even assuming Hart would obtain an "unfair advantage" (thus establishing the third factor), the absence of the second factor—that a court had

---

[56]  *See Hart III* at Doc. No. 105.

MEMORANDUM OF DECISION - 35

accepted the earlier assertions—was fatal to the trustee's argument. *Id.* at 10–13.

Acceptance of a position for purposes of this doctrine can include entry of

discharge, confirmation of plan, relief from stay, or other affirmative action by a

bankruptcy court which relies on or presumes the fact or position as then asserted

by the litigant. But dismissal of a bankruptcy case without any showing that the

court relied on the assertion is insufficient to establish acceptance. *Id.* Dismissal

of *Hart I* and *Hart II* was based on patent statutory ineligibility. There was no

ruling of the Court in either case, or in *Hart III*, that "accepted" the prior

inconsistent assertion. The trustee's generalized contention that Hart was "playing

fast and loose" with parties and the Court certainly echoed language found in

some of the cases, and on the whole of the record was accurate, but the trustee

failed to establish one of the specific requirements for application of judicial

estoppel mandated by this Circuit's precedent.

The Court also overruled the trustee's objection on the generalized ground

that Hart's amendment of schedule C was made in bad faith. Noting that Hart

disclosed the existence of District Court Case in *Hart I*, and disclosed the Property

(albeit with the assertion that it was held in trust) in *Hart II* and *Hart III*, the Court

found that the trustee had failed to establish bad faith within the scope and reach

of the then-applicable case law. *Id.* at 13–16. As Hart notes, the Court also

stated, in this part of the ruling, that it "cannot conclude from this record then that

the debtor was attempting to conceal the property as an asset when the debtor

disclosed both the litigation and later the property." *Id.* at 15–16.

Finally, the Court rejected an unbriefed argument of the trustee seeking to disallow the exemption on the basis of "fraud." *Id.* at 16–18.  Each of the rulings emphasized what the trustee argued, as well as the evidence he elicited at the August 2013 hearing from Hart, and the decision was limited to those arguments and that evidence.

**DISCUSSION AND DISPOSITION**

The UST advances three causes of action in seeking to deny Hart's discharge: concealment of or failure to maintain books and records, § 727(a)(3); continuing concealment of the Property, § 727(a)(2)(A); and false oath or account regarding the tractor, § 727(a)(4)(A).[57]

**A.    Section 727(a)(3)**

The Bankruptcy Appellate Panel has summarized:

> Section 727(a)(3) provides for denial of discharge where, among other things, a debtor failed to keep or preserve any recorded information from which his financial condition or business transactions might be ascertained.  The underlying purpose of this subsection is "to make discharge dependent on the debtor's true presentation of his financial affairs."  *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008).
>
> Even so, § 727(a)(3) "does not require absolute completeness in making or keeping records."  *Id.*  Instead, a debtor must only "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his

---

[57]  Prior to trial the UST dismissed an additional count under § 727(a)(4)(A) and (a)(7) related to the tractor.

MEMORANDUM OF DECISION - 37

business transactions for a reasonable period in the past." *Id.* A debtor's "duty to keep records is measured by what is necessary to ascertain [his] financial status." *Moffett v. Union Bank*, 378 F.2d 10, 11 (9th Cir. 1967); *see also U.S. Trustee v. Hong Minh Tran (In re Hong Minh Tran)*, 464 B.R. 885, 893 (Bankr. S.D. Cal. 2012) (type of debtor, as well as debtor's sophistication, informs the bankruptcy court's determination).

. . .

An objector establishes a § 727(a)(3) prima facie case by showing that: (1) the debtor failed to maintain and preserve adequate records and (2) this failure rendered it impossible to ascertain the debtor's financial condition and material business transactions. *In re Caneva*, 550 F.3d at 761. Once the objector makes this showing, the burden shifts to the debtor to justify the inadequacy or nonexistence of records. *Id.* Whether a debtor failed to maintain and preserve adequate records is a finding of fact, which [is reviewed] for clear error. *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401–02 (9th Cir. 1990).

*Hussain v. Malik (In re Hussain)*, 508 B.R. 417, 423–24 (9th Cir. BAP 2014). In a recent decision, following and quoting *Caneva*, this Court stated:

A debtor must provide adequate records for the businesses he owns or controls. *See Caneva*, 550 F.3d at 762 ("Without the records . . ., [a creditor] cannot determine what assets [the debtor's] business entities held or may still hold, what assets passed through them and where they might have gone, and what their present value is, if anything. . . . Thus we hold that when a debtor owns and controls numerous business entities and engages in substantial financial transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation.").

*Adams v. McKay (In re McKay)*, 504 B.R. 649, 654 (Bankr. D. Idaho 2014).

*McKay* also discussed the burden of proof that shifts to a debtor to justify the inadequacy or nonexistence of records once a prima facie case under § 727(a)(3) has been made. It noted that, in the Ninth Circuit, "'justification for

MEMORANDUM OF DECISION - 38

[a] bankrupt's failure to keep or preserve books or records will depend on . . .

whether others in like circumstances would ordinarily keep them.'"  *Id.* at 655

(quoting *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1299 (9th Cir. 1994)).

In an earlier *Cox* decision, the Ninth Circuit identified several potentially

relevant factors in considering claims under § 727(a)(3).  They include: the

debtor's intelligence and educational background; his experience in business

matters; the extent of his involvement in the business for which discharge is

sought; his reliance on another party to keep records including what, if anything,

he saw or was told that indicated the other party *was* keeping records; and any

record keeping or inquiry duties imposed on the debtor by state law.  *Cox*, 904

F.2d at 1404 n.5.[58]

### 1.    Dearth of records regarding the trusts

Hart caused the formation of two trusts and transferred his primary and

singularly most valuable asset—his home—into them.  Trust records were

effectively nonexistent.  No originals or copies of any trust agreements were

provided.  Though there is a short "declaration" regarding the WPV Trust, Ex. 44,

and the warranty deeds, Exs, 46, 47 and 49, there are no other formation,

---

[58]  *See also Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 324 (Bankr. E.D.N.Y. 2005)
(listing as nonexclusive factors "whether a debtor was engaged in business and, if so, the
complexity and volume of the business; the amount of the debtor's obligations; whether the
debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's
education, business experience and sophistication; the customary business practices for record
keeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's
existing books and records; the extent of any egregious conduct on the debtor's part; and the
debtor's courtroom demeanor.").

operational or financial documents or records for the trusts.

Though there were "trustees," Hart's own testimony, in addition to that of the identified "trustees," makes clear that Hart managed all the financial affairs of the trusts.  The "trustees" were shown to have been such in name or title only, and they performed no cognizable duties or services as trustees.  Hart—though purportedly as a "manager" of the trust assets rather than as trustee—performed all functions.

In doing so, he kept clearly inadequate records.  Hart asserted he paid "rent" of $600/month (a figure he initially established and never changed over some 16 years) in cash, placing it in a desk drawer.  He testified that he would "withdraw" cash from the drawer as needed for the residence's expenses.  And Hart indicated he also, at times, obtained cashier's checks for some expenses, like taxes, and at other times would load and use a prepaid debit card.  However, no records of rental income or trust-paid expenses were maintained.

He bought items at home improvement and other stores, and kept an amalgam of receipts for those purchases related to the house, as well as some receipts for payment of property taxes and other expenses.  But there were no other documents or records maintained.  There are no ledgers or other contemporaneous accounts.  The receipts were not shown to be complete or inclusive.  Hart's "summaries" introduced into evidence were created well after the fact.  These were not persuasive exhibits.  Nor, even considering them in

MEMORANDUM OF DECISION - 40

conjunction with other documents Hart turned over to Crawford at the UST's
office, were they adequate to meet the burden imposed on Hart under § 727(a)(3)
and the case law noted above.[59]  The problems with Hart's failure to keep, and
consequently a lack of, records were patent.  So, too, was the futility of Hart's *post
facto* attempt to create records.  This was—or should have been—obvious to
Hart.[60]

Under the precedent construing § 727(a)(3), the burden shifted to Hart to
justify the failure to keep or preserve adequate records.

### a.    Sophistication and reasonable reliance

In attempting to meet that burden, Hart asserts that he relied in part on
"advice" he received from Green, an acquaintance and a lawyer (though not one
licensed in Idaho), that the trust need not keep records.  Hart paints himself as
relatively unsophisticated, and asserts that such reliance was reasonable under the

---

[59]  *See also Macway v. U.S. Trustee (In re Macway)*, 2014 WL 3817103, *3 (D. Nev.
Aug. 4, 2014) (noting that the purpose of § 727(a)(3) "is to make the privilege of discharge
dependent on a true presentation of the debtor's financial affairs" and that places the obligation
on the debtor to maintain proper records that accurately present his financial affairs) (quoting
*Cox*, 904 F.2d at 1401).  In *Macway*, the court affirmed a bankruptcy court decision that found
inadequate summaries that were "recreated" by the debtor post-bankruptcy in large part from
memory and with a lack of bank records and documentation to support them.  *Id.* at *4.  The
district court's decision was affirmed.  *Davis v. Macway (In re Macway)*, 2016 WL 4039745 (9th
Cir. July 28, 2016).

[60]  In the District Court Case, analogous issues arose regarding Hart's record keeping for
purposes of complying with the Internal Revenue Code and IRS regulations as to his businesses'
affairs and his claims to business expense and other deductions.  The District Court found that
"adequate records" were lacking, and that what was provided were not contemporaneous but
rather after-the-fact creations based on miscellaneous receipts, check registers and his
recollection.  The "memory-jogging" approach did not meet the applicable substantiation
requirements applicable there.  *See*, *e.g.*, Ex. 94 at 13–23.  It is no more successful here.

MEMORANDUM OF DECISION - 41

totality of the circumstances. The argument does not hold.

Hart is well educated. He not only acquired a college degree and became a licensed engineer, he also obtained a MBA from one of the nation's premier business schools. His career was and is in engineering, a technical and demanding, detail-oriented field.[61] He is also a self-professed expert in federal tax law, having studied extensively at the Library of Congress and having read numerous legal decisions, all in his development and publication of a 400+ page book on the subject. He was elected to the Idaho House of Representatives and served on several committees including those dealing with revenue and taxation, judiciary and rules, state affairs and transportation. And Hart generally appeared thoughtful on the witness stand. He clearly appreciated the context, even nuance, of certain questions, and answered many of them carefully.[62]

In light of this and the balance of the record, Hart's claimed lack of sufficient sophistication to appreciate the need for record keeping is not persuasive.

Hart also contends that it was reasonable for him to rely on Ortega, Estrada, the Ormeshers, and Green in creating the trusts and seeing that they were properly

---

[61] *See Macway*, 2014 WL 3817103 at *5 (noting that debtor was a "smart man, with an MBA"). *See also Hussain*, 508 B.R. at 425 n.6 (noting cases where lack of education, sophistication, and business experience, or a reliance on others, justified lack of adequate records).

[62] However, when on other occasions pressed on such testimony through cross-examination, he claimed lack of recollection or lack of understanding which, to the Court, was an inconsistency that lacked credibility.

MEMORANDUM OF DECISION - 42

established and administered.[63]  But, recall, he had contributed his single most

valuable asset to the trusts.  He claims to have done so in order to protect and

provide for his daughter.  The circumstances would indicate that Hart would (and

the evidence reflects that he could) ensure that it was done legally and correctly,

and that the trusts would be established, documented and operated in such a way

as to guarantee they were legitimate and served that intended and specifically

expressed goal.[64]  He did not do so.

       The alleged reliance on these other individuals was not shown to be

reasonable.  Hart kept no trust records.  Nothing in the evidence establishes any

reasonable reliance on the "trustees" to keep records.  In fact, none of the putative

trustees were shown to have ever taken their role or responsibility seriously, and

none effectively performed any services whatsoever.  In "managing" the Property

on a daily basis, Hart was aware of that vacuum.

       In short, the Court concludes Hart failed to credibly show a lack of

sophistication, or a reliance on others, adequate to justify his failure to keep and

preserve records.[65]

---

[63]  Of note, though, is Hart's testimony that he sent the 150-page draft WPV Trust
agreement back to Ortega unsigned, and never executed a trust agreement regarding the WPV
Trust.

[64]  Hart conceded in his testimony that there was another "goal" for the transfer of the
Property and the tractor to the SEH Trust, which was to protect those assets from the IRS and
Idaho State Tax Commission as well as from other creditors.

[65]  *Cf.*, *McKay*, 504 B.R. at 656 (evidence established that debtor reasonably relied on
his son, who had taken accounting in college and earned an MBA, to keep and maintain the

(continued...)

### b.    Loss of records

There is a potential defense to a § 727(a)(3) action where a debtor can show an intervening catastrophic event in which records were lost or destroyed. But there are limitations on that defense.

In *U.S. Trustee v. Kandel (In re Kandel)*, 2015 WL 1207014, *9–13 (Bankr. N.D. Ohio Mar. 13, 2015), the debtor offered several justifications for his lack of records, including lack of sophistication; a combination of roof collapse, flood and computer virus destroying his records; and a reliance on others to maintain the records.  The court found the justifications unpersuasive both because there was an absence of supporting evidence and also due to a lack of credibility.  As to the catastrophic loss, the debtor failed to produce any corroborating evidence.  *Id.* at *12.  The attempted defense was therefore unavailing.[66]

Similarly, in *Tow v. Henley (In re Henley)*, 480 B.R. 708 (Bankr. S.D. Tex. 2012), the debtors responded to the trustee's prima facie case under § 727(a)(3) by arguing a significant portion of their records were lost in a move from Hot Springs, Arkansas, to Houston, Texas.  The court held, however, that "[t]o be

---

[65] (...continued)
records of a business in which both were stockholders, officers and directors).

[66]   The court had earlier commented: "Debtor's totally unsupported excuses were of the 'dog ate my homework' ilk: roof collapse, flood and computer virus.  Coincidentally, Debtor's accountant, located over 2,000 miles away in California, also experienced unsupported catastrophic computer failures that destroyed the record that had been used to complete tax returns."  *Id.* at *4.

MEMORANDUM OF DECISION - 44

excusable, the loss of books and records must be outside the debtor's control." *Id.*

at 783 (citing *Fid. & Guar. Life Ins. Co. v. Fioravante Settembre (In re*

*Settembre)*, 425 B.R. 423, 434 (Bankr. W.D. Ky. 2010) (holding that "inexcusably

lost records do not provide a defense to [a] § 727(a)(3) count.").  Those debtors

failed to show that their records were destroyed or lost due to some event beyond

their control, like a theft, or a fire, flood, hurricane or other Act of God.  The

debtors, in arguing the records were lost during the move, "adduced no credible

testimony that the loss of their records was beyond their control."  The defense

was based on the testimony of one of the debtors.  The court found a lack of

credibility "renders her statement to be the equivalent of the 'dog ate my

homework' excuse" and that "the fault for the loss of the records belongs entirely

to the Debtors." *Id.* at 783.

Here, Hart said that there "may have been" copies of trust documents or

other records, but they were lost in two successive "chaotic" office moves.  He

testified that, during a legislative session when he was in Boise, he was advised he

had to vacate his Coeur d'Alene leased office building in about three weeks.  Hart

had people working for him in Coeur d'Alene, and he tasked them with finding a

new office to lease.  He said the landlord's employees started "cannibalizing" the

fixtures in the office, and tore down an adjacent garage.  When Hart returned that

weekend, he found his office unlocked and some of his property (though not

explicitly records) outside in the snow.  He stated "I couldn't even lock the door

MEMORANDUM OF DECISION - 45

for a couple of weeks and I think in the chaos of that move, maybe the trust document disappeared."[67]  Hart recounted a similar series of events the next year when he was renting an office condo.  Once again receiving notice he would have to relocate, he had the people working at his engineering office move his property. It, too, somehow led to an alleged loss of records.[68]

Even accounting for the need to run his engineering office and business remotely during the roughly four month Idaho legislative session, and only being able to return on weekends, Hart was certainly aware of the need for protecting his business and personal records.  Recall, Hart's problems with the IRS started with the contests over his 1994–1996 taxes.  The initial tax court litigation ended with the Supreme Court's denial of certiorari in 2003.  In addition to the knowledge he gained in his prior battles with the IRS about the importance of his records, he was further reminded of it.  His legislative pay was garnished in 2005.  IRS liens, including those naming the SEH Trust as nominee, were filed in 2008.  The District Court Case was commenced in 2011.  At whatever point during Hart's legislative service when the documents were allegedly "lost" in some sort of rented office move, Hart was critically aware of the need to preserve and protect

---

[67]  *See* Tr. at 306–07.  This comment's reference to "the trust document" refers to the document creating the SEH Trust.  (Recall, Hart testified that he had returned, unsigned, the 150-page draft trust agreement for the WPV Trust, and that no other such document was ever executed.)  He conceded that he never caused a restatement of the SEH Trust to be created after the claimed loss of the document in the office moves.

[68]  *See* Tr. at 306–08.

MEMORANDUM OF DECISION - 46

competent and appropriate business, trust and financial records.  Taking care of
that need was within his power and control.

Hart failed to establish that the absence of records was due to a catastrophic
or similar event outside of his control.  The testimony about the loss of Hart's
records was vague and lacked reliable detail or confirmation.  His explanation was
not persuasive.

The UST established that Hart failed to maintain and preserve adequate
records, and that this failure makes it impossible to ascertain Hart's financial
condition and material business transactions.  Under *Caneva* and the other
authorities, this prima facie showing shifted the burden of proof to Hart to justify
the inadequacy or nonexistence of the records.  550 F.3d at 761.  Hart did not do
so.  The action under § 727(a)(3) is well taken, and Hart's discharge will be
denied on that basis.

### B.    Section 727(a)(2)(A)

The Code states in pertinent part:

> (a)   The court shall grant the debtor a discharge, unless—
>        . . .
>        (2) the debtor, with intent to hinder, delay, or defraud a creditor
> or an officer of the estate charged with custody of property under this
> title, has transferred, removed, destroyed, mutilated, or concealed, or
> has permitted to be transferred, removed, destroyed, mutilated, or
> concealed—
>
>            (A) property of the debtor, within one year before the
> date of the filing of the petition[.]

Section 727(a)(2)(A).

In objecting to discharge under § 727(a)(2)(A), the UST is required to establish that Hart, with intent to hinder, delay or defraud a creditor or an officer of the estate (*i.e.*, bankruptcy trustee), transferred, removed, destroyed or concealed property within one year before the date of the filing of the petition. *See Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010) (citing *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)).  The debtor's intent need not be "fraudulent" to satisfy the statute because the Code's language is in the disjunctive, thus an intent to hinder or delay a creditor is sufficient.  *Id.* (citing *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)).[69]

Here, the transfers of the Sarah Loop Property into the WPV Trust and then the SEH Trust occurred well over a year prior to the petition date in *Hart III*.  But the UST argues that Hart thereafter concealed not only the true facts regarding the transfer but, critically, also concealed his continuing secret interest in the property, with requisite intent, and that such concealment occurred during the one year statutory period.

---

[69]  Whether a debtor harbors the "intent" to hinder, delay or defraud the trustee or creditors is a question of fact, which can be established by circumstantial evidence or by inferences drawn from a course of conduct.  It is common for a trier of fact to rely on circumstantial evidence to resolve factual issues bearing on a party's state of mind.  *See United States v. Sullivan*, 522 F.3d 967, 974–76 (9th Cir. 2008).  Indeed, absent an admission, circumstantial evidence typically is the only means by which a party may prove another's state of mind.

### 1.    Hart's "relevance" objection

At trial, Hart objected to the admission of evidence of acts or conduct
occurring more than one year before the petition date in *Hart III* on relevance
grounds.  Hart argues that the Code's language limits the inquiry to acts occurring
within the one year pre-filing period, thus rendering irrelevant anything preceding
that period.  After so objecting with regularity, Hart's counsel was allowed a
continuing objection on this point, to be resolved in this post-trial Decision.

Hart relies primarily on language from *Rosen v. Bezner*, 996 F.2d 1527
(3rd Cir. 1993).  In particular, Hart points to a statement that "Congress intended
this penalty [denial of discharge under § 727(a)(2)(A)] to apply only where there
is proof that the debtor intentionally did something improper during the year
before bankruptcy; *improper conduct before the one year period is forgiven*."  *Id.*
at 1534 (emphasis by Hart).

Initially, the Court observes that Hart has failed to establish that this
language has been construed to bar, on relevance grounds, proof of facts
occurring prior to the year preceding bankruptcy.  Further, Hart erroneously
truncates, and then overemphasizes, the quoted language.  The relevant portion of
the *Rosen* decision more fully states:

> We will therefore remand to the bankruptcy court for a factual
> determination not only as to whether Rosen retained a secret interest
> during the relevant period, but also as to whether any such concealment
> was accompanied by an actual intent to hinder or defraud creditors.  In
> making the determination regarding subjective intent, the court should

consider Rosen's own testimony regarding his state of mind as well as
the surrounding circumstantial evidence of intent.  *See*, *e.g.*, *In re
Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981) ("Intent, however, 'must
be gleaned from inferences drawn from a course of conduct.'")
(quoting *Vecchione*, 407 F.Supp. at 615).

In conclusion, we again note that § 727 is to be construed
liberally in favor of the debtor and that a total bar to discharge is an
extreme penalty.  From the statutory language, it is clear that Congress
intended this penalty to apply only where there is proof that the debtor
intentionally did something improper during the year before
bankruptcy; improper conduct before the one year period is forgiven.
Here, even if the debtor did transfer property with an intent to hinder
or defraud creditors prior to the one year period, it may be that he
retained no interest in the property after the transfer or, even if he did,
that he did not believe that he retained an interest which would be
reachable by creditors who became aware of it.

*Id.* at 1534 (footnote omitted).  That footnote states:

Were we to accept the position advocated by the trustee and adopted
by the courts below that an intent to hinder creditors present at the time
of the initial transfer automatically suffices to meet the requirement of
an improper intent during the year before bankruptcy, then the one year
limitation in § 727(a) would be rendered meaningless in a great many
cases.

*Id.* at 1534 n.8.

The decision in *Rosen* is obviously not as rigidly cabined as Hart contends.

Of significance is that court's remand to the trial court to determine if the debtor

"retained a secret interest during the relevant [one-year] period" and "whether any

such concealment [in that one-year period] was accompanied by an actual intent to

hinder or defraud creditors."  *Rosen* also explained:

Section 727 provides an exception to the general rule that a
court must grant a debtor his discharge; that exception consists of two

MEMORANDUM OF DECISION - 50

components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor). The party seeking to bar discharge must prove that *both* of these components were present during the one year period before bankruptcy; anything occurring before that one year period is forgiven. In this case, it is undisputed that Rosen's transfer of the residence occurred more than a year before discharge [*sic*]. Thus, the summary judgment denying a discharge in this case can only be sustained if the uncontradicted evidence demonstrates that Rosen concealed property from his creditors, with the requisite intent, during the year before bankruptcy.

Under the "continuing concealment" doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year. *See In re Olivier*, 819 F.2d 550, 555 (5th Cir. 1987) (discussing "the well-settled doctrine that . . . the concealment of an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy"). This doctrine does not negate the "act" requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before bankruptcy warranting a denial of discharge.

*Id.* at 1531. The court went on to distinguish between concealment of an interest in property (which is actionable if that concealment occurs, with proscribed intent, within the year preceding bankruptcy) and the concealment of a transfer, and to address the question of whether the subjective intent within the statutory period was established for purposes of summary judgment. *Id.* at 1531–34.

In the Ninth Circuit, the doctrine of continuing concealment of an interest in transferred property is well accepted. The Bankruptcy Appellate Panel in *DeNoce v. Neff (In re Neff)*, 505 B.R. 255 (9th Cir. BAP 2014), following

MEMORANDUM OF DECISION - 51

*Lawson*, 122 F.3d 1237, explained that:

> [u]nder this doctrine, discharge can be denied under § 727(a)(2)(A), even though the subject transfer occurred more than one year before the debtor filed bankruptcy, if the debtor allowed his or her interest in the property to remain concealed into the year preceding the bankruptcy filing. *In re Lawson*, 122 F.3d at 1240. "Concealment" in this sense focuses on the debtor's intent to conceal any "interest" in the transferred property into the year before the bankruptcy filing, not whether the debtor intended to conceal "the transfer." *Id.*
> . . .
> [The doctrine] applies only when the offending conduct—debtor's intentional concealment of an interest in transferred property—has been ongoing into the year prior to the debtor's bankruptcy filing.

505 B.R. at 267–68. *Lawson* also explained that "a transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing." 122 F.3d at 1241. There, in discussing *In re Olivier*, 819 F.2d 550 (5th Cir. 1987), the Court of Appeals stated:

> In *Olivier*, debtor spouses—when faced with liability in a serious personal injury lawsuit—transferred title in their home to the wife's mother and properly recorded the transfer seven years prior to filing their petition. *Id.* at 551. Debtors continued to live in and maintain the property up to filing their petition. The bankruptcy court found that the debtors retained a secret beneficial interest in the legally-transferred property and therefore that they continued to conceal the property interest from creditors within the year prior to the filing of the petition. *Id.* at 553. The bankruptcy court reasoned that, where evidence demonstrates that the debtor retained a secret interest that could be realized by her creditors, despite an ostensible transfer of property, such a sham transaction suffices to deny her a discharge. *Id.* at 555.

MEMORANDUM OF DECISION - 52

The logic and rationale behind the "continuing concealment" doctrine as explained in *Olivier* is compelling; we therefore adopt the doctrine as the law of the Ninth Circuit. *See also Rosen*, 996 F.2d 1527 (3d Cir. 1993) (adopting doctrine of continuing concealment); *In re Kauffman*, 675 F.2d 127 (7th Cir. 1981) (same).

*Lawson*, 122 F.3d at 1241.

In the present case, there was a transfer. It first occurred when the deeds to the Property from Hart to the WPV Trust were recorded in August 1997. Exs. 46, 49. The issue is whether Hart retained a secret beneficial interest in the Property notwithstanding that transfer. Thus the facts surrounding the transfer, and Hart's actions regarding the trusts and the Property from that transfer up to the time of the petition's filing *Hart III* are relevant to the Court's determination of continuing concealment, with intent, of an interest in the property within that final pre-filing year.[70] The Court concludes Hart's "relevance" objection is not well taken and it is overruled.

### 2.    Preclusion

Hart also argues that this Court's ruling on the objection of the chapter 7 trustee to the homestead exemption in *Hart III* should be preclusive of the UST's claims that Hart concealed his interest in the Property within the year preceding bankruptcy for purposes of § 727(a)(2)(A). Hart's pre-trial brief, Adv. Doc. No.

---

[70] These include his false statements on the sworn CIS about his residence, and the failure to there disclose the transfer of the Property.

MEMORANDUM OF DECISION - 53

103, invoked the doctrine of res judicata.[71]

The Court finds that this doctrine does not apply. It has previously explained:

> The Ninth Circuit has framed the two basic preclusion concepts—claim preclusion and issue preclusion—as follows:
>
>> Generally, the preclusive effect of a former adjudication is referred to as 'res judicata.' The doctrine of res judicata includes two distinct types of preclusion, claim preclusion and issue preclusion. Claim preclusion treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same claim or cause of action. Claim preclusion prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.

---

[71]   Under Fed. R. Civ. P. 8(c)(1), incorporated here by Fed. R. Bankr. P. 7008, res judicata is an affirmative defense that must be pleaded in responding to a complaint or it is generally waived. *Bush v. Woods (In re Bush)*, 2005 WL 6960185, *6 (9th Cir. BAP Dec. 15, 2005); *In re Tews*, 502 B.R. 566, 569 n.5 (Bankr. D. Idaho 2013). Hart's answer to the UST's complaint, *see* Adv. No. 13-07017-TLM at 6, fails to assert this defense. And while the answer purports to reserve the right to add other affirmative defenses, no amendments were ever sought or made. In a pretrial order entered on November 13, 2014, in these consolidated adversary proceedings, the parties agreed and the Court ordered that the pleadings were settled. Later modifications of this pretrial order concerned discovery cutoff dates and the continuation of the trial date, but never reopened the pleadings. The argument of the preclusive effect of the October 2013 exemption ruling was raised for the first time in Hart's January 2016 pretrial brief. It was not asserted in accord with the Rules and therefore is properly denied on that basis.

Notwithstanding the Rule violation, exceptions to Rule 8(c) are recognized where, despite the late assertion of the defense, the opposing party is given fair notice of the asserted defense, and when addressing it does not result in unfair surprise or prejudice to that party. *Bush*, 2005 WL 6960185, at *6. The UST was able to address the question at trial and in its briefing. And the issues revolve around uncontested facts (the events before this Court in the chapter 7 case), not on extraneous facts that the UST was unable to address through discovery and trial preparation. The Court therefore addresses Hart's assertion of the defense in this Decision. While that defense is found wanting under the authorities and will be rejected, that is not solely due to Hart's violation of Rule 8(c)(1).

> *Cogliano v. Anderson (In re Cogliano)*, 355 B.R. 792, 802 (9th Cir.
> BAP 2006) (citing *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321–22
> (9th Cir.1988)). Issue preclusion, in contrast, "[P]revents relitigation
> of all 'issues of fact or law that were actually litigated and necessarily
> decided' in a prior proceeding. . . . The issue must have been 'actually
> decided' after a 'full and fair opportunity' for litigation." *Id.* at 802
> (citing *Robi*, 838 F.2d at 322).

*Wisdom v. Gugino (In re Wisdom)*, 2016 WL 1039694, at *16 (Bankr. D. Idaho

Mar. 15, 2016).

Because the allegedly preclusive decision was issued by a federal court

(*i.e.*, this Court), federal preclusion law applies. *Id.* at *17. Issue preclusion has

six elements that must be satisfied. The five threshold requirements are (1)

identical issue; (2) actually litigated in the prior proceeding; (3) necessarily

decided in that proceeding; (4) the former decision is final and on the merits; and

(5) the party against whom preclusion is sought is either the same, or in privity

with, the party in the prior proceeding. The sixth element is a mandatory

additional inquiry as to whether imposition of preclusion in the particular setting

would be fair and consistent with public policy. *Id.* at *16–17 (citing *Cogliano*,

355 B.R. at 802–03 (citing *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817,

824–25 (9th Cir. BAP 2006)); *see also Paulo v. Holder*, 669 F.3d 911, 917 (9th

Cir. 2011).

The primary issue implicated in the present case is whether the chapter 7

trustee and the UST are in privity with one another. A person who is not a party

to the prior action (a "non-party") generally has not had the full and fair

MEMORANDUM OF DECISION - 55

opportunity to litigate the issues settled there and as a general rule will not be bound by a judgment to which he was not a party. In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the United States Supreme Court noted that "nonparty preclusion" can be predicated on several factors, including a pre-existing "substantive legal relationship" between the party to be bound and the party to the underlying judgment or, in certain limited circumstances, a party might be bound because it was adequately represented by someone with the "same interests" in the prior suit. 553 U.S. at 894.

Hart contends that because the UST establishes, maintains and supervises a panel of private trustees under 28 U.S.C. § 586(a)(1), supervises the administration of cases and trustees under 28 U.S.C. § 586(a)(3), and appoints an interim trustee in each chapter 7 case under § 701(a) of the Code, it is in privity. The argument does not hold.

*Taylor* noted that privity is a factual issue that requires a case by case finding. *Id.* at 899. It held that "[a] party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) The interest of the nonparty and her representative are aligned . . . and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900. Both factors are required.

The UST is a part of the Department of Justice. The chapter 7 trustee is a

MEMORANDUM OF DECISION - 56

private individual.  That the UST reviews, "supervises" and can audit or even remove trustees does not make them the same party, nor—importantly—does it suggest the UST directs or controls the litigation decisions or conduct of trustees. A trustee makes an independent decision to bring a motion, objection or other action and, once brought, the trustee decides how to present or try that issue.

The chapter 7 trustee, Munding, filed an objection to an amended exemption claim, which could result in increasing assets for the distribution to creditors.  He was not seeking to deny discharge, nor to recover property through transfer avoidance.[72]  The UST, on the other hand, is pursuing an adversary proceeding objecting to discharge under § 727(a).  While there was, in terms often used in preclusion analysis, a "transactional nexus" because issues revolved around the Property, the legal nature and goals of the litigation were not identical.[73]

Hart notes that counsel for the UST "listened" to the Court's oral ruling on the exemption issue.  That is clearly established by the record.  What is not established is Hart's conjecture that doing so was "presumably in [the UST's] supervisory capacity."  Adv. Doc. No. 119 at 39.  And, even if the UST decided to

---

[72]  The 1997 transfer by recorded deed was well outside the look-back period of § 548 as well as the longer state law look-back period that can be invoked under § 544(b).

[73]  Indeed, no one could reasonably suggest that a panel trustee's failure to file a § 727(a) complaint, *see* Rule 4004(a), would constitute a bar on the UST filing such an action.  They are different parties.  The bar date for objections to discharge was April 22, 2013.  Munding filed no § 727(a) complaint.  The UST sought and obtained an extension of time in order to determine whether to bring such an action and to file the same.  *Hart III* at Doc. Nos. 65, 88, 101.

MEMORANDUM OF DECISION - 57

listen in order to evaluate trustee's performance in the case, that would not limit

the UST's ability—as a separate party—to seek a denial of discharge.

"Parallel legal interests alone, identical or otherwise, are not sufficient to

establish privity." *Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054

(9th Cir. 2005). That both Munding in the objection and the UST in the later trial

focused on Hart's conduct and disclosures in filing the serial bankruptcies does

not make either the agent of the other or render them in privity.[74]

More recently, in *United States v. Wanland*, 830 F.3d 947 (9th Cir. 2016),

the Ninth Circuit considered a defendant's res judicata argument concerning the

government's prosecution of him for tax related charges, including tax evasion,

where his debts had been discharged in bankruptcy.[75] In affirming a lack of

privity, the Circuit noted that "Courts have not assumed that all federal agencies

are in privity for res judicata purposes, and instead look to the substance of

---

[74] In accord is *United States v. Modanlo*, 954 F. Supp. 2d 384 (D. Md. 2013), which
denied a defendant's contention that the government should be collaterally estopped from
criminally prosecuting him for obstruction of bankruptcy proceedings because the bankruptcy
court had already decided that issue in defendant's favor when the U.S. Trustee raised similar
allegations. The district court held that the defendant's "claim falters most clearly on . . . the
identity or 'privity' requirement. With respect to that element, the test 'is one of substance, not
form.'" *Id.* at 387. The court noted that the applicable authorities (there applying Maryland law)
focus on "the nature of the interests binding the two parties, and, correspondingly, whether they
share the same incentive in their separate litigation attempts." *Id.* The court rejected the
argument that the U.S. Attorney and the U.S. Trustee are the same party because both are
divisions of the Department of Justice and the argument that the U.S. Attorney was in privity
with the U.S. Trustee, "because they operate pursuant to completely different statutory purposes,
powers and interests." *Id.* at 387–89.

[75] The Court of Appeals doubted that the contention of discharge of the tax debt was
entirely accurate. *Id.* at 957 n.4.

claims." *Id.* at 956. It concluded that "the IRS in a bankruptcy action and the United States government in a criminal action are not in privity." *Id.* at 957.

Applying these principles, the Court finds that Hart's chapter 7 trustee, seeking to deny an exemption and thus free the value of an asset for distribution to creditors, and the United States Trustee, here seeking to enforce a limitation on a debtor's right to discharge of all debts, are not in privity. Additionally, there is not an identity of claims between the two actions.[76]

Therefore, the Court concludes that the § 727(a)(2)(A) action is not barred by claim or issue preclusion.

### 3.    Merits

In *Lawson*, a creditor recovered judgment against the debtor and, on the same day, the debtor recorded a deed of trust on her residence in favor of her mother. The debtor also later borrowed funds from a third party (Elsam Company) secured by the residence, and debtor's mother subordinated her deed of trust to that of this new lender. More than a year after these events, the debtor filed a chapter 7 petition. The bankruptcy court focused on the debtor's ability to

---

[76] There are also other problems with Hart's contention. For example, in rejecting the exemption objection, the Court ruled that it was unable to "conclude from *this* record" that the trustee had made out his case for concealment or that the asserted "concealment" was, as the trustee argued, made in the original *Hart III* schedule A and constituted grounds to bar the later inconsistent assertion in the same case by way of an amended schedule A. The evidentiary record in this adversary proceeding is of course a different record. And the concealment urged by the UST in the present action has to do with the "continuing concealment" in the one year period immediately *preceding* the filing of *Hart III*.

use the property as collateral and obtain a loan, and to have her mother

subordinate to that loan, as evidence that the transfer to the mother was a sham

with debtor retaining a secret benefit, *i.e.*, the use and control of the property.  The

bankruptcy court denied discharge, and the BAP affirmed.  122 F.3d at 1239–40.[77]

As noted, the Ninth Circuit found the reasoning in *Olivier* and the

articulation of the continuing concealment doctrine compelling, and it found that

*Lawson* was factually "virtually indistinguishable."  "In both cases, debtors

transferred property to their mothers in order to avoid paying creditors' judgments

from state lawsuits.  In both cases, the debtors retained an interest in the property.

In *Olivier*, the interest was continuing to live in and maintain the house.  In the

instant case, the interest is continuing to live in the house and subordinating her

mother's deed of trust in order to obtain the . . . loan."  *Id.* at 1241.  The court also

rejected Lawson's contention that there was no continuing concealment, in part

because "Lawson continued to live in the Edgemar residence, thereby retaining a

controlling interest in the property."  *Id.* at 1241 n.3.

Here, the transfer (via deed) was well outside the one-year period of

§ 727(a)(2)(A).  However, the evidence establishes that Hart retained virtually all

the interests of an owner of the real property, including, as in *Olivier* and *Lawson*,

---

[77]  The BAP found that debtor's "subordination of her mother's deed of trust in favor of
Elsam allowed an inference to be made that the debtor retained a secret benefit in the residual
equity in the property purportedly encumbered by the deed of trust which constituted a
continuing concealment of assets."  *Id.* (quoting *Lawson v. Hughes (In re Lawson)*, 193 B.R. 520,
524 (9th Cir. BAP 1996)).

the uninterrupted possession of and right to live in the Property.  Hart dealt with

the Property as his own, and without any regard to the burdens associated with a

trust as titled owner.  It was Hart, not any one of the so-called "trustees," who

handled everything involving the Property.  Other than the title record, nothing

regarding the Property, or Hart's sole and exclusive control and use of the

Property, changed after the deeds to the WPV Trust or subsequently the SEH

Trust.  The putative ownership and control of the Property by these trusts and their

titular "trustees" was a sham.  The Court finds that, notwithstanding the recorded

deeds, Hart maintained a secret and concealed interest in the Property within the

sense and contemplation of the Ninth Circuit case law.

The next question, then, is whether the concealment of that interest

continued during the one year preceding the filing of the petition in *Hart III* on

January 13, 2013, with the requisite intent.  As the Ninth Circuit BAP recognized

in *Cooke v. Renshaw (In re Cooke)*, 2016 WL 4039699 (9th Cir. BAP July 22,

2016), an "intent to hinder or delay 'is a question of fact that requires the trier of

fact to delve into the mind of the debtor and may be inferred from surrounding

circumstances.'"  *Id.* at *6 (quoting *In re Searles*, 317 B.R. 368, 379 (9th Cir BAP

2004)).[78]  Moreover, "debtor's 'course of conduct may be probative of the

---

[78]  *See also Taylor v. Good (In re Taylor)*, 2016 WL 7189837, *5 n.6 (9th Cir. BAP Dec.
2, 2016) (addressing badges of fraud that may constitute circumstantial evidence of intent for
purposes of § 727(a)(2)) (citing *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 242–43 (9th
Cir. BAP 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008)).

MEMORANDUM OF DECISION - 61

question.'" *Id.*

All acts from January 13, 2012, through January 13, 2013, are clearly

relevant under § 727(a)(2)(A).[79]  During this period, Hart prepared a worksheet

for McFarland to use in preparing the schedules and statements for *Hart I*, which

was filed on May 29, 2012.  In that worksheet, Hart expressly stated that it was

"unknown who owns the residence." Ex. 212 at 4.  That was patently false.  Hart

knew that the residence was, by deed, titled in the name of the SEH Trust, and that

he had been the one who initiated the idea of the trust, and commenced the

original transfer of title with the initial deed to the WPV Trust.  And, if Hart's

worksheet answer was meant to convey that some question existed about

ownership, given the pending issues between Hart and the IRS over the bona fides

of the SEH Trust and the transfer of the Property to it, he certainly did not make

that issue or situation clear to his attorney.  As McFarland testified, if he had been

given such information, there would have been additional inquiry and disclosure.

Moreover, Hart also knew that the IRS and Lafferty had on May 2, 2012,

entered into a stipulation in the District Court Case, Ex. 84, that would set aside

the transfer of the Property to the Trust.  Still, he executed the petition, schedules

and statements and they were filed May 29, 2012.  The disclosure in schedule A

---

[79]  As to evidence of Hart's acts and conduct prior to January 13, 2012, the same are only
considered to the extent relevant and probative to Hart's retaining a secret interest in the
Property, and to his continuing concealment of that interest with requisite intent during the
critical one-year period.

MEMORANDUM OF DECISION - 62

was materially incomplete, and Hart knew it.  So, too, was the answer to the question in the SOFA about third party property in Hart's possession.  Hart never disclosed his holding of the "rent" money in the desk drawer that he contended belonged to the SEH Trust.  Nor did he disclose his possession of the Property under a right to "rent" and live on the Property until Sarah turned 45 or until Hart passed away.[80]

At the § 341(a) meeting in *Hart I*, Hart refused to answer direct questions posed by the IRS as to the Property and his related financial affairs, and many of those posed by the attorney for the trustee.  Ex. 216.  That examination occurred on July 13, 2012, well after the May 2, 2012 stipulation in the District Court Case, yet Hart continued to obfuscate and evade acknowledging an interest in the Property.  Hart's conduct reflects an active and actual subjective intent and design to conceal from creditors (and from the bankruptcy trustees for such creditors) his interests in the Property.[81]

---

[80]   When held up to the light, the entire concept of "rent" is illusory.  And it can be viewed as intentionally so.  The assertion of a rent obligation (though questionable in its cash-in-the-drawer nature and minimal $600 amount) facilitated Hart's concealment.  Without ever identifying the details as to the ownership of the Property, Hart could and did tell McFarland and bankruptcy trustees that he "rented" a residence.  He compounded the concealment by his evasive, indeed deceptive, answer to the trustee's attorney's inquiry in *Hart I* about rent checks by saying "You'd have to ask him" (referring to Lafferty, the SEH Trust's trustee)."  Ex. 216 at 48–49.  Hart knew at the time he said this that there were never any "checks" and that Lafferty did not receive and had never received any rent.

[81]   *Hart II* was filed in 2012, and continued this pattern of behavior and lack of disclosure.  And, though it occurred after *Hart III* was filed, Hart's declaration, Ex. 154, denied any intent to hide information from or to mislead McFarland in *Hart I* because the "efficacy of the trust" became an issue only <u>after</u> *Hart I* had been filed.  This was demonstrably false given

(continued...)

Therefore, the Court finds and concludes Hart concealed his secret interest in the Property within the year preceding the subject bankruptcy petition, and did so with the actual intent to hinder creditors. The UST established by a preponderance of the evidence that Hart's discharge should be denied under § 727(a)(2)(A).

**C.      Section 727(a)(4)(A)**

The UST also seeks denial of discharge under § 727(a)(4)(A). That section operates to deny a discharge to a debtor who "knowingly and fraudulently" makes a false oath or account in the course of a bankruptcy case. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (citing *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990)).[82]

---

[81] (...continued)
the IRS' pursuit of the Property as held by the SEH Trust as "nominee" and by the events in the District Court Case.

[82]   As this Court explained in *Murphy v. Vanschoiack (In re Vanschoiack)*, 356 B.R. 56, 63 n.6 (Bankr. D. Idaho 2006):

> A debtor is required to make full and complete disclosure of assets, liabilities and transactions. . . .  This requirement is enforced, *inter alia*, by § 727(a)(4).  The function of the requirement is to ensure accurate and dependable information is given to the Court, trustee, and creditors upon which they can rely without the need for additional inquiry. . . .  Debtors may not elect what to disclose; all property and interests in property must be disclosed.

### 1.    Elements

To prevail, the UST must show by a preponderance of the evidence that:
"(1) the debtor made a false oath in connection with the case; (2) the oath related
to a material fact; (3) the oath was made knowingly; and (4) the oath was made
fraudulently." *Retz*, 606 F.3d at 1197 (quoting *Roberts v. Erhard (In re Roberts)*,
331 B.R. 876, 882 (9th Cir. BAP 2005)).

"A false statement or an omission in the debtor's bankruptcy schedules or
statement of financial affairs can constitute a false oath." *In re Retz*, 606 F.3d at
1196 (quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R.
163, 172 (9th Cir. BAP 2007), *aff'd* 578 F.3d 1167, 1168 (9th Cir. 2009)
(adopting the BAP's statement of applicable law)). "A fact is material if it bears a
relationship to the debtor's business transactions or estate, or concerns the
discovery of assets, business dealings, or the existence and disposition of the
debtor's property. An omission or misstatement that detrimentally affects
administration of the estate is material." *Retz*, 606 F.3d at 1198 (quoting *Khalil*,
379 B.R. at 173, and *Wills*, 243 B.R. at 63). "The recalcitrant debtor may not
escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly
omitted or falsely stated information concerned a worthless relationship or
holding; such a defense is specious." *Vanschoiack*, 356 B.R. at 64 (quoting
*Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir. 1984)). And,
"[t]he asset's value need not be 'material,' nor must a debtor 'succeed in harming

creditors to warrant denial of discharge.'" *Id.* (citing *Bernard*, 96 F.3d at

1281–82). *See also Wills*, 243 B.R. at 63 ("A false statement or omission may be

material even if it does not cause direct financial prejudice to creditors.").

Section 727(a)(4)(A) requires a false oath be made knowingly. A debtor

acts knowingly in making a false oath "if he or she acts deliberately and

consciously." *Retz*, 606 F.3d at 1198 (quoting *Roberts*, 331 B.R. at 883–84). The

Court must also find that the false oath was made fraudulently. *Id.* To

demonstrate fraudulent intent, the UST must show that the false oath was made

with the intention and purpose of deceiving the creditors or trustee—that is, the

UST must show actual intent. *Id.* at 1198–99. Actual fraudulent intent is usually

proven by circumstantial evidence, including inferences drawn from a debtor's

conduct. *Id.*

Generally, a debtor who acts in reliance on the advice of his attorney lacks

the intent required to deny him a discharge of his debts. *First Beverly Bank v.

Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986) (citing *Hultman v. Tevis*,

82 F.2d 940, 941 (9th Cir. 1936); *In re Nerone*, 1 B.R. 658, 660 (Bankr. S.D.N.Y.

1979)). However, the debtor's reliance must be in good faith. *See Retz*, 606 F.3d

at 1199 ("The advice of counsel is not a defense when the erroneous information

should have been evident to the debtor."). Reliance on counsel is not effective if

the debtor has sufficient reason to know that the disclosures are inaccurate in

addition to being incomplete. Debtors are obligated to review their schedules and

MEMORANDUM OF DECISION - 66

statements before verifying them as being true and correct to the best of their knowledge and belief. They have the opportunity to see how the assets and information they disclose to counsel are characterized, and are obligated to correct errors, misstatements or omissions.

### 2.    Application

The UST premises this cause of action on Hart's failure to disclose the tractor in his initial *Hart III* schedule B or, alternatively, if he believed it to be owned by the Trust, by his failure to disclose his possession of that property in his SOFA.[83]

Hart personally purchased the tractor in 1996 for $6,500.[84]  He testified that he then transferred it to the SEH Trust.  There is no proven documentation regarding that transfer.  And Hart did not disclose the tractor as a transferred asset in the CIS.

Hart did not disclose the tractor in any regard in *Hart I* or *Hart II*.  The Court has already found that Hart personally used and controlled the tractor throughout the entire time he had it, and that no trustee of the SEH Trust was ever involved.

Material here, Hart did not disclose the tractor in his *Hart III* schedules as

---

[83]  The UST also notes a similar issue with the Audi, since Hart failed to disclose that he owned it or, alternatively, failed to show it on his SOFA as in his possession but owned by White Pine.  Adv. Doc. No. 123 at 67.  However, the Audi, unlike the tractor, was not specified in the underlying complaint.  *See* Adv. Doc. No. 1 at 12–13 (in Adv. No. 13-07017-TLM).

[84]  *See also* Ex. 40 (1996 cashiers check and bill of sale).

his own nor, given his assertion of trust ownership, did he disclose his possession

of this property of a third party in the *Hart III* SOFA. He maintained his position

of SEH Trust ownership until he filed an amended schedule B in May 2013, some

four months after the *Hart III* petition date, disclosing the tractor as his own and

worth $3,000. Ex. 138. When asked about that change, he stated that it was a

"point of contention" and he "didn't want to argue over it[.]"[85] Of course, it had

been a point of contention long before that, and had been raised in questioning.[86]

Hart suggests that the tractor was not a "material" omission. He notes

Munding's testimony that, after expenses of sale, the tractor would not in his

opinion as trustee provide a net amount sufficient to make a meaningful

distribution to creditors.[87] However, Munding's analysis is not controlling, or

dispositive of materiality. Materiality under § 727(a)(4)(A) is not dependent on

the value of the asset or its ability to generate a sizeable distribution to creditors.

Materiality exists if it bears a relationship to the debtor's business transactions or

estate or concerns his assets, business dealings or the existence or disposition of

property. *Retz*, 606 F.3d at 1198.

Hart also argues that his failure to disclose the tractor was not "knowing"

and "fraudulent." He explains that when preparing schedules for *Hart I*, he just

---

[85]  Tr. at 484–85.

[86]  *See* Ex. 216 (§ 341(a) examination in *Hart I*) at 28-29 (IRS questioning); Ex. 217
(§ 341(a) examination in *Hart II*) at 9 (trustee questioning).

[87]  Tr. at 120.

MEMORANDUM OF DECISION - 68

overlooked the tractor because, at that time, it was being used by Mosqueda.[88]

The UST notes, however, the inconsistency in Hart's ability to make detailed

disclosure and valuation of some *de minimis* assets in the material he gave to

McFarland, *see* Ex. 211, and his disclosure, as property belonging to another, of a

$75 table saw owned by one individual and some personal property owned by

Sarah, *see* Ex. 212.

Hart suggests that error was carried over when Stevens used the first

bankruptcy's schedules and statements to prepare those in *Hart II* and, then, in

*Hart III*. However, as just noted, in the examinations at the § 341(a) meetings in

*Hart I* and *Hart II*, Hart was questioned about the tractor by IRS' counsel and the

trustee. Thus, even if the argument is accepted that the tractor was initially just

overlooked in *Hart I*, the matter was brought back to mind.

Whatever errors may have been made by Stevens in perpetuating the

disclosures in *Hart I* (disclosures that were, of course, premised directly on what

Hart did or did not tell McFarland in that case), do not insulate Hart. The tractor

was an issue clearly implicated and known to Hart before he was required to

review and verify the schedules in *Hart III*. Reliance on counsel is no defense

where a debtor is aware of the omission or inaccurate statement. Even if Stevens

did a poor job in relying on documents from the prior cases, that does not excuse

---

[88] Mosqueda used the tractor from April to August 2012. *Hart I* was filed May 29, 2012
and the schedules were filed June 12, 2012. Exs. 100, 102.

MEMORANDUM OF DECISION - 69

Hart's verifying the incomplete disclosures.

And, the Court finds that this was not simply a matter of Hart "overlooking" the disclosure of the tractor when filing his third sequential bankruptcy. He had to claim the tractor as either his own or as the trust's but in his possession. By failing to address it in either fashion, and omitting any mention of it, the Court concludes Hart acted knowingly, *i.e.*, deliberately and consciously. The Court also concludes that the omission was made fraudulently, *i.e.*, with the intention and purpose of deceiving creditors.

The UST has therefore proven by a preponderance of the evidence its cause of action under § 727(a)(4)(A).

**CONCLUSION**

Upon the foregoing findings and conclusions, Debtor's discharge will be denied under § 727(a)(2)(A), § 727(a)(3) and § 727(a)(4)(A). The UST may submit a form of judgment consistent with this Decision.

DATED:  December 21, 2016



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 70